## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

| | | |
|---|---|---|
| SHALE ROYALTY, LLC | * | |
| PLAINTIFF | * | |
| | * | |
| V. | * | |
| | * | CASE NO.  4:18CV00621 SWW |
| MMGJ ARKANSAS, LLC | * | |
| (originally named as BHP Billiton | * | |
| Petroleum (Fayetteville) LLC) and | * | |
| FLYWHEEL ENERGY | * | |
| PRODUCTION, LLC (originally | * | |
| named as SWN Production (Arkansas) | * | |
| LLC, formerly known as SEECO, Inc | * | |
| doing business as SEECO) | * | |
| DEFENDANTS | * | |

## OPINION and ORDER

Plaintiff Shale Royalty, LLC ("Shale") brings this action pursuant to the Court's diversity jurisdiction, seeking overriding royalty payments from Defendants/Cross-Claimants Flywheel Energy Production, LLC ("Flywheel")[1] and MMGJ Arkansas Upstream, LLC ("MMGJ").[2]  Before the Court are (1) Shale's motion for partial summary judgment against Flywheel for breach of contract [ECF Nos. 78, 79, 80], Flywheel's response in opposition [ECF No. 101], and Shale's

---

[1]Flywheel initially appeared in this case under the name SWN Production (Arkansas) LLC, a company formerly known as SEECO, Inc.
[2]MMGJ initially appeared in this case under the name BHP Billiton Petroleum (Fayetteville) LLC.

reply [ECF No. 124]; (2) Shale's motion to exclude the opinion of Tom Daily [ECF Nos. 82, 83] and Flywheel's response opposition [ECF No. 102]; (3) Shale's motion for partial summary judgment against MMGJ [ECF Nos. 84, 85, 86], MMGJ's response in opposition [ECF No. 116], and Shale's reply [ECF NO. 125]; (4) MMGJ's motion for partial judgment against Flywheel [ECF Nos. 87, 88, 89], Flywheel's response in opposition [ECF No. 113], and MMGJ's reply [ECF No. 126]; (5) MMGJ's motion to exclude the opinion of Thomas A. Daily [ECF Nos. 90, 91], Flywheel's responses in opposition [ECF Nos. 102, 110]; (6) Flywheel's motion for summary judgment [ECF Nos. 92, 93, 94], Shale's response in opposition [ECF Nos. 111, 112], MMGJ's response in opposition [ECF No. 116]; and (7) Flywheel's replies [ECF Nos. 127, 128]; and (8) Shale's motion for partial summary judgment against Flywheel [ECF No. 95, 96, 97], Flywheel's responses in opposition [ECF Nos. 101, 114], and Shale's reply [ECF NO. 123].

After careful consideration, and for reasons that follow Shale's motion for partial summary judgment against Flywheel for breach of contract [ECF No. 78] is denied, MMGJ's motion for partial summary judgment against Flywheel for breach of contract [ECF No. 87] is denied, Shale's motions for partial summary judgment against MMGJ and Flywheel on statutory claims [ECF Nos. 84, 95] are denied, Flywheel's motion for summary judgment [ECF No. 92] is granted in part

and denied in part as provided in this opinion, and Shale's and MMGJ's motions to

exclude the testimony of Thomas A, Daily [ECF Nos. 82, 90] are denied as moot.

## I.

Shale holds overriding royalty interests (the "ORRIs") in 60 productive oil

wells (the "Wells"), MMGJ holds a working interest in the underlying oil and gas

leases (the "Leases"),[3] and Flywheel operates the Wells pursuant to joint operating

agreements (the "JOAs") entered by parties including Flywheel and MMGJ.

Shale issued several written demands to MMGJ and Flywheel seeking payment for

Shale's share of production.  After MMGJ and Flywheel denied the demands for

payment, Shale filed this lawsuit seeking relief under several theories.  As to

Flywheel, Shale claims breach of the JOAs, failure to pay under Ark. Code Ann.

§§ 15-74-604 and 15-74-601, and unjust enrichment.  As to MMGJ, Shale claims

breach of leases and assignments and failure to pay under Ark. Code Ann. §§ 15-

74-604 and 15-74-601.  Flywheel and MMGJ filed crossclaims, each charging the

other with the responsibility to pay Shale under the JOAs.

By way of background, in late 2007, Stephens Production Company

("Stephens") assigned the Leases to Chesapeake Exploration, LLC

---

[3]"An overriding royalty interest is generally carved out of, and constitutes a part of,
the working interest created by an oil and gas lease." 3 Summers Oil and Gas
§ 29:13 (3d ed.).  "A 'working interest' is an operating interest under an oil and gas
lease that provides its owner with the exclusive right to drill, produce, and exploit
the minerals. *Id.*

("Chesapeake").  MMGJ is the successor-in-interest to BHP Billiton Petroleum

(Fayetteville) LLC, which acquired the Leases from Chesapeake.  The lease

assignments conveyed "a 76% net revenue interest, reserving 24% overriding

royalty interest inclusive of all existing burdens, proportionately reduced."[4]

Stephens then assigned the reserved ORRIs to Shale, and those assignments

provide that the ORRIs "shall be free of all cost and expense, other than a

proportionate share of all production taxes, severance taxes, windfall profit taxes

and other similar taxes levied and assessed on the oil, gas and other minerals

produced from the land covered by the Leases . . . . "[5]

Stephens's assignments to Chesapeake and Shale were recorded in the

relevant property records in December 2007 and January 2008.  Subsequently, the

JOAs, which utilize the American Association of Petroleum Landmen Form 610-

1982 Revised, were executed and incorporated  into integration orders issued by

the Arkansas Oil and Gas Commission.  Although the JOAs were entered at

different times and govern drilling operations on different portions of land, the

terms of the agreements are identical, and each JOA designates Flywheel as the

operator.

---

[4]ECF Nos. 87-5, at 5; 87-6, at 2.
[5]ECF Nos. 87-3, 87-4.

The JOAs allow a party to opt out of participation in proposed drilling operations.  In the event that a party elects non-consent status, the consenting parties take on the costs and risk of production in proportions that they elect to accept.[6]  In return, non-consenting parties temporarily relinquish all interest in the well and related share of production up to the point that the costs equal 100% of the non-consenting party's share, plus a "non-consent penalty" equal to 400% of that share.[7]  This penalty/recovery period is designed to compensate the consenting parties for the assumption of greater risk and obligations.  It is undisputed that MMGJ elected non-consent status on each of the Wells, except one: Hurst  8-13 7-5H32.[8]

The JOAs contain interrelated provisions that allocate costs and production among the parties.  Article III.B provides:

> Unless changed by other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid . . . by the parties as their interests are set forth in Exhibit "A."  In the same manner, the parties shall also own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of one-eighth (1/8th) which shall be borne as hereinafter set forth.[9]

---

[6]ECF No. 78-15, at 7 (JOA Art. VI.B).
[7]*Id.*; ECF No. 78-19, at 3 (Integration Order 8.B.2).
[8]ECF No. 8, at 2 n.2.
[9]ECF No. 78-15, at 4 (JOA Art. III.B).

It is undisputed that Exhibit A to the JOAs provides no information about overriding royalty interests[10] and that absent a contract provision to the contrary, the ORRIs burden MMGJ's working interest. Article III.C states this default rule:

> Unless changed by other provisions, if the interest of any party in any lease covered hereby is subject to any royalty, overriding royalty, production payment or other burden on production in excess of the amount stipulated in Article III.B.,[11] such party so burdened shall assume and alone bear all such excess obligations and shall indemnify and hold the other parties hereto harmless from any and all claims and demands for payment asserted by owners of such excess burden.[12]

Article VI.B.2.b provides an exception to the default rule:

---

[10]Article II of the JOA specifies that "Exhibit A" shall include the following information:
> (1) Identification of lands subject to this agreement,
> (2) Restrictions, if any, as to depths and formations,
> (3) Percentages of fractional interests of parties to this agreement,
> (4) Addresses of parties for notice purposes.

ECF Nos. 78-15 & 87-7, at 3. Exhibit A to the JOAs in this case list five topics of information. *Id*. at 24. First, under the heading "DESCRIPTION OF LANDS SUBJECT TO THIS AGREEMENT" appear the section, township, range and county of the contract area. Second, under the heading "RESTRICTIONS, IF ANY AS TO DEPTHS, FORMATIONS, OR SUBSTANCES, the exhibit reads: "There are no restrictions." Third, under the heading "PERCENTAGES OF PARTIES TO THIS AGREEMENT," spaces reserved for owners' names and individual percentages are left blank, but a space reserved for the parties' total interest reads: "100%." Fourth, under the heading "OIL AND GAS LEASES SUBJECT TO THIS AGREEMENT," the exhibit reads: "All the oil and gas leases and oil and gas interests owned by the parties hereto insofar and only insofar as such oil and gas leases and oil and gas interests are included within the Contract Area covered hereby." Fifth, Exhibit A sets forth the address of Flywheel's predecessor, SEECO, Inc., as the address of parties for notice purposes.
[11]Article III.B provides that the "parties shall . . own all production of oil and gas from the Contract Area subject to the payment of royalties to the extent of one-eighth (1/8th) . . . . " ECF No. 78-15, at 4.
[12]ECF No. 78-15, at 4 (JOA Art. III.C).

6

> During the period of time Consenting Parties are entitled to receive Non-Consenting Party's share of production, or the proceeds therefrom, Consenting Parties shall be responsible for the payment of all production, severance, excise, gathering and other taxes, and all royalty, overriding royalty and other burdens applicable to Non-Consenting Party's share of production *not excepted by Article III.D.*[13]

Pursuant to Article VI.B.2.b, to the extent that MMGJ elected non-consent status, consenting parties became responsible to pay overriding royalties burdening MMGJ's working interest during the recovery/penalty period *unless* the following exception under Article III.D, titled "Subsequently Created Interests," applied:

> If any party should hereafter create an overriding royalty, production payment or other burden payable out of production attributable to its working interest hereunder, *or if such a burden existed prior to this agreement and is not set forth in Exhibit "A", or was not disclosed in writing to all other parties prior to the execution of this agreement by all parties, or is not a jointly acknowledged and accepted obligation of all parties (any such interest being hereinafter referred to as "subsequently created interest" irrespective of the timing of its creation and the party out of whose working interest the subsequently created interest is derived being hereinafter referred to as "burdened party"),* and:

>> 1. If the burdened party is required under this agreement to assign or relinquish to any other party, or parties, all or a portion of its working interest and/or the production attributable thereto, said other party, or parties, shall receive said assignment and/or production free and clear of said subsequently created interest and the burdened party shall indemnify and save said other party, or parties, harmless from any and all claims and demands for payment asserted by owners of the subsequently created interest; and,

---

[13]ECF No. 78-15, at 4 (JOA Art. VI.B.2.b)(emphasis added).

> 2. If the burdened party fails to pay, when due, its share of expenses chargeable hereunder, all provisions of Article VII.B. shall be enforceable against the subsequently created interest in the same manner as they are enforceable against the working interest of the burdened party.[14]

Pursuant to Article III.D, if the ORRIs qualify as "subsequently created interests," MMGJ remained the burdened party, even during a recovery/penalty period. And to the extent that MMGJ elected non-consent status and was therefore required to relinquish its share of production under Article VI.B.2 , the consenting parties took that assignment free and clear of MMGJ's burden, and MMGJ must indemnify the consenting parties with respect to any and all claims and demands for payment asserted by Shale.

## II.

Each party moves separately for summary judgment as to which party, MMGJ or Flywheel, is responsible to pay Shale under the JOAs. Shale and MMGJ point to Flywheel, [15] and Flywheel points to MMGJ.

---

[14]ECF No. 78-15, at 4 (JOA, Art. III.D)(emphasis added).

[15]Shale, not a party to the JOAs, has standing to sue only if it qualifies as a third-party beneficiary of the agreements. Under Arkansas law, "'[a] contract is actionable by a third party when there is substantial evidence of a clear intention to benefit that third party.'" *Perry v. Baptist Health*, 358 Ark. 238, 245, 189 S.W.3d 54, 58 (2004) (quoting *Little Rock Wastewater Util. v. Larry Moyer Trucking,* 321 Ark. 303, 902 S.W.2d 760 (1995)). "It is not necessary that the person be named in the contract if he is a member of a class of persons sufficiently described or designated in the contract." *Id.*

To recap, pursuant to Article III.D, if any party's working interest is burdened by an overriding royalty, production payment, or other burden prior to execution of the JOA, that existing burden is treated as a "subsequently created interest," and the party out of whose working interest the subsequently created interest is derived is the burdened party who must indemnify other parties for any and all demands for payment made by the owner of the subsequently created interest.  In order to remove an existing burden from the subsequently created interest category, one of three affirmative steps must be taken: (1) the burden must be "set forth in 'Exhibit A,'" (2) the burden must be "disclosed in writing to all other parties prior to the execution of [the JOA]," or (3) the burden must be "jointly acknowledged and accepted obligation of all parties."

It is undisputed that the ORRIs were not disclosed on Exhibit A,[16]  and no party contends that they were jointly acknowledged and accepted obligations of all

---

Shale argues that the JOAs evince a clear intent to benefit overriding royalty owners by requiring that consenting parties pay non-consenting parties' overriding-royalty burdens during the penalty/recovery period.  However, the parties appear to agree that if the ORRIs qualify as "subsequently created interests" under Article III.D, Shale does not qualify as an intended beneficiary of the JOAs.  Furthermore, Flywheel and MMGJ have filed cross-motions for summary judgment asserting that the other is liable under the JOAs, making it unnecessary to decide whether Shale qualifies as an intended beneficiary.

[16]If MMGJ's 76% net-revenue interest had been listed on Exhibit A, which was not the case, it might be argued that an existing "overriding royalty, production payment or other burden payable out of production attributable to [MMGJ's]

parties. The question is whether the ORRIs were "disclosed in writing to all other parties prior to the execution of [the JOA] by all parties." Shale and MMGJ contend that such was the case because years prior to execution of the JOAs, assignments of the ORRIs to Shale were publicly recorded. Shale and MMGJ correctly note Arkansas's recording statute provides that "[e]very deed, bond, or instrument of writing affecting the title, in law or equity, to any real or personal property within [the] state which is . . . recorded shall be constructive notice to all persons from the time the instrument is filed for record . . . ." Ark. Code. Ann. § 14-15-404(a)(1). The second paragraph of the recording statute provides:

> No deed, bond, or instrument of writing for the conveyance of any real estate, or by which the title thereto may be affected in law or equity, made or executed after December 21, 1846, shall be good or valid against a subsequent purchaser of the real estate for a valuable consideration without actual notice thereof or against any creditor of the person executing such an instrument obtaining a judgment or decree which by law may be a lien upon the real estate unless the deed, bond, or instrument, duly executed and acknowledged or proved as required by law, is filed for record in the office of the clerk and ex officio recorder of the county where the real estate is situated.

Ark. Code Ann. § 14-15-404(b). Pursuant to the recording statute, a recorded instrument affecting real estate is valid against a subsequent purchaser for value and without notice, and the subsequent purchaser is charged with constructive

---

working interest" was disclosed in writing to all other parties prior to execution of the JOAs.

notice of the recorded interest.  *See Walls v. Humphries*, 2013 Ark. 286, 7, 428 S.W.3d 517, 522 (2013) (citation omitted).  This case, however, involves a contractual dispute, not a priority or title battle, and for reasons that follow, the Court finds that the terms of the JOAs require more than constructive notice.

Arkansas law[17] prescribes several rules governing the interpretation and construction of contracts.  "'[T]he primary rule in the construction of instruments is that the court must, if possible, ascertain and give effect to the intention of the parties.'" *Smith v. Arrington Oil & Gas, Inc.*, 664 F.3d 1208, 1212 (8th Cir. 2012) (quoting *Harris v. Stephens Prod. Co.,* 310 Ark. 67, 72, 832 S.W.2d 837, 840 (1992)).  Accordingly, "in construing any contract, Arkansas courts 'must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain, ordinary meaning.'" *Id*. (quoting *First Nat'l Bank of Crossett v. Griffin,* 310 Ark. 164, 169, 832 S.W.2d 816, 819 (1992)).  Here, the words "disclosed in writing to all other parties prior to the execution of [the JOAs] by all parties" reveal that disclosure in writing must be made *by a party* to "to all *other* parties."  Constructive notice by operation of the recording statute does not satisfy this unambiguous method for disclosing an existing burden.

---

[17]The parties apply Arkansas law, and the JOAs provide that "all matters . . . including . . . matters of performance, non-performance, breach, remedies, procedures, rights, duties, and interpretation or construction, shall be governed and determined by the law of the state . . . of Arkansas."  ECF No. 78-15, at 15 (JOA at Article XIV.B).

Another rule governing contract interpretation is that "'different clauses of a contract must be read together and the contract construed so that all of its parts harmonize, if that is at all possible.'" *Smith*, 664 F.3d at 1212 (quoting *Griffin*, 301 Ark. at 169-70, 832 S.W.2d at 819). "A construction that neutralizes any provision of a contract should never be adopted if the contract can be construed to give effect to all provisions.'" *Smith*, 664 F.3d at 1213 (quoting *Griffin*, 301 Ark. at 170, 832 S.W.2d at 820). Here, the alternate methods under Article III.D for removing an existing burden from inclusion as a subsequently created interest indicate that disclosure in writing to all other parties requires more than constructive notice. Where an existing burden is "set forth on Exhibit A" or "jointly acknowledged and accepted by all parties," the parties have taken active steps among themselves to affirmatively document or acknowledge existing burdens, which affect the allocation of costs and production going forward. The methods for disclosure prescribed under Article III.D are rendered superfluous if public recording, a common occurrence, is tantamount to disclosure in writing to all other parties. The Court finds that the methods for disclosing existing burdens under Article III.D are designed to provide clear communication regarding existing burdens. Imputed or constructive notice will not do.

Finally, Flywheel notes that the construction proposed by MMGJ and Shale would, for practical reasons, necessitate a title search prior to execution of the

JOAs, in contradiction of other provisions.  Article IV.A  requires the operator to initiate a title examination on the drilling unit prior to commencement of drilling operations on the initial well, not before execution of the JOA.[18]  The JOAs do not require that a party contributing an oil and gas lease or other interest to show proof of title prior to execution of the agreement.  Instead, if the title search required before drilling reveals a failure of title as to leases and interests set forth on "Exhibit A," Article IV.B provides solutions and gives "the party contributing the affected lease or interest . . . ninety . . . days . . . to acquire a new lease or other instrument curing the . . . title failure . . . ."[19]  Looking at the terms of the JOAs as a whole, the agreements contemplate that the parties will disclose the extent of their working interests from the outset and that a title search will be performed after, not before, execution of the agreements.

MMGJ makes the additional argument that Flywheel had actual knowledge of the ORRIs before it entered "most" of the JOAs.  To support this contention, MMGJ submits a copy of a title opinion, dated July 23, 2008, regarding Section 34, Township 9 North, Range 13 West, Van Buren County, Arkansas, which notes that MMGJ's working interest was burdened by ORRIs owned by Shale.[20] Flywheel disputes that it had actual knowledge of the ORRIs with respect to

---

[18]ECF No. 78-15, at 4 (JOA, Article IV.A).
[19]ECF No. 78-15, at 5 (JOA, Art. IV.B).
[20]ECF No. 87-9.

Section 34 before execution of the JOAs.  As proof, Flywheel provides copies of the relevant Integration Order, JOA, and title opinion, dated June 24, July 3, and July 23, 2008, respectively.

Even if Flywheel had actual knowledge regarding a portion of the ORRIs, which is far from clear, the JOAs still required disclosure in writing to all other parties prior to the execution of the JOAs.  *Cf. Hall Contracting Corp. v. Entergy Services, Inc.*, 309 F.3d 468 (8th Cir. 2002)(applying Arkansas law, contract provision requiring a written change order enforceable despite assertion that operator had actual knowledge).

In keeping with the plain language of the JOAs and construing the contracts so that all parts harmonize, the Court finds that the ORRIs were *not* "disclosed in writing to all other parties prior to the execution of [the JOA] by all parties." Regarding claims brought under the JOAs, the undisputed record establishes that the ORRIs are subsequently created interests under Article III.D, and MMGJ remains liable to pay Shale its share of production under the ORRIs and must indemnify Flywheel with respect to payments due Shale.  Shale's and MMGJ's motions for partial summary judgment, which assert that the ORRIs do not qualify as subsequently created interests, are therefore denied.  Flywheel's motion for summary judgment, which seeks judgment in Flywheel's favor on all claims, is

granted only to the extent of the findings set forth above.  Flywheel's motion is denied in all other respects.

## III.

In separate motions, Shale moves for summary judgment against MMGJ and Flywheel, seeking relief under two Arkansas statutes that prescribe time limits for the payment of oil and gas royalties and impose penalties for the failure to make timely payments.  The first statute, Ark. Code Ann. § 15-74-601, provides:

> The proceeds from the sale of oil or gas production . . . shall be paid to persons legally entitled thereto, commencing no later than six (6) months after the date of the first sale and thereafter no later than sixty (60) days at the end of the calendar month within which subsequent production is sold . . . . "

Ark. Code Ann. § 15-74-601(a).  The statute provides that payment shall be made by the "first purchaser of production," Ark. Code Ann. § 15-74-601(b)(1), defined as "the first commercial purchaser after completion of the well and shall not include purchasers of oil or gas during initial testing prior to completion."  Ark. Code Ann. § 15-74-601(c).  The first purchaser is excused from making payment and "the owner of the right to drill and to produce under an oil and gas lease or force pooling order shall be substituted for the first purchaser" in cases where "the owner and purchaser have entered into arrangements in which the proceeds are paid by the purchaser to the owner, who assumes the responsibility of paying the proceeds to persons legally entitled thereto."  Ark. Code Ann. § 15-74-601(f).

Failure to pay proceeds within the prescribed time limits results in a penalty of 12% interest on nonpaid proceeds, Ark. Code Ann. 15-74-601(e), and a 14% interest penalty is imposed when payment is willfully withheld, without just cause. Ark. Code Ann. 15-74-602.  Finally, "[a]ny delay in determining the persons legally entitled to an interest in the proceeds from production caused by unmarketable title to the interest shall not affect payments to persons whose title is marketable."  Ark. Code Ann. § 15-74-60(d).   The Arkansas Supreme has held that "the marketability of a title is to be determined by the public record." *TXO Prod. Corp. v. Page Farms, Inc*., 287 Ark. 304, 306, 698 S.W.2d 791, 792 (1985).

The second statute, Ark. Code Ann. § 15-74-604, provides:

> In the event the operator under an oil or gas lease fails to pay oil or gas royalties to the mineral owner or his or her assignee within one hundred eighty (180) days after oil or gas produced under the lease is marketed, the unpaid royalties shall bear interest thereafter at the rate of twelve percent (12%) per annum until paid.

Ark. Code Ann. § 15-74-604(b).[21]

Shale does not seek a double recovery but maintains that both MMGJ and Flywheel are responsible to pay proceeds due and penalties under the statutes. According to Shale, the amount due through June 2019, excluding interest, totals

---

[21]It is not clear that Shale qualifies as a proper payee, described under the statute as "the mineral owner or his or her assignee."  Different from a mineral owner's royalty, an overriding royalty, carved out of the working interest by an oil and gas lease, is "an interest in oil and gas produced at the surface, free of the expense of production." 2 Williams & Myers, Oil and Gas Law § 418 (2019).

$215,411.66.[22]  Shale states that it does not possess information needed to calculate damages for production after June 2019 and proposes that interest and proceeds due after June 2019 be addressed at trial.

For its response to Shale's statutory claims, MMGJ contends that the ORRIs do not qualify as subsequently created interests, which shifts the responsibility to pay Shale from MMGJ to Flywheel.  However, Shale's statutory claims seek payment independent of the JOAs, and for reasons previously explained, the ORRIs qualify as subsequently created interests under Article III.D.

Flywheel argues that if the ORRIs are subsequently created interests, the consenting parties took MMGJ's working interest "free and clear" of the ORRIs, and "Shale therefore cannot possibly be a person who is legally entitled to the payment of proceeds from the production allocated to the MMGJ non-consent interest . . . ."[23]  Flywheel is mistaken.  Given the Court's finding that the ORRIs are subsequently created interests under Article III.D, the consenting parties that took assignment of MMGJ's working interest during the recovery/penalty period received the assignment free and clear of the ORRIs *as to MMGJ*, and MMGJ is obligated to indemnify the consenting parties with respect to Shale's demands for

---

[22]To support this total, Shale presents exhibits attached to the affidavit of Donna King, Flywheel's director of land administration and revenue, who testifies that she is familiar with the production and prices for the Wells marketed by Flywheel. ECF No. 84-6.
[23]EFC No. 114, at 4.

payment.  Shale, however, is not a party to the JOAs, and Shale's right to payment is neither eliminated nor diminished by operation of Article III.D.  *See Retro Television Network, Inc. v. Luken Commc'ns, LLC*, 696 F.3d 766, 769 (8th Cir. 2012) (citing *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 294, 122 S. Ct. 754 (2002) ("It goes without saying that a contract cannot bind a nonparty.").  The undisputed evidence demonstrates that Shale qualifies as a person legally entitled to the proceeds derived from the sale of oil or gas production under § 15-74-601(a).  Furthermore, the record is void of evidence that Shale lacked clear record title to the ORRIs at any time.

Flywheel further disputes that Shale is due $215,411.66 through June 2019. According to Flywheel, the amount claimed by Shale "does not include the portion of the MMGJ non-consent interest which was allocated to participating working interest owners who elected to take their share of the gas in-kind and market independently."[24]   Flywheel argues:  "With respect to participating working interest owners who elected to take their share of the MMGJ non-consent interest in-kind and market it independently, Flywheel was neither the "owner" of the interest nor the recipient of any proceeds related to the interest."[25]

---

[24]ECF No. 114, at 2-3.
[25]ECF No. 114, at 3.

While more information is needed to determine the total proceeds due, Shale is entitled to payment of the full amount provided under the ORRIs.  The JOAs are "'contract[s] typical to the oil and gas industry [that among other things] provide for the allocation of costs and production *among the parties* to the agreement and provide for recourse *among the parties* if one or more default in their obligations.'" *Tawes v. Barnes*, 340 S.W.3d 419, 426 (Tex. 2011) (emphasis added) (quoting *Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 344 n.1 (Tex.2006)).  The JOAs do not, however, defeat Shale's right to proceeds derived from the sale of production.  Stephens's assignments of the Leases to MMGJ and the reserved ORRIs to Shale were executed and recorded before execution of the JOAs.  Shale is entitled to payment of the full amount due, regardless of whether a consenting party elected to take its proportionate share of production in-kind.

After careful consideration, the Court finds that several questions remain as to Shale's statutory claims, including but not limited to the total production payments due, the party responsible for making the payment, and whether payment was withheld willfully and without cause.  Shale's motions for summary judgment as to statutory claims are therefore denied.

## IV.

Shale and MMGJ move to exclude proposed expert witness testimony by

Mr. Thomas A. Daily as to the intended meaning of "disclosed in writing to all

other parties prior to the execution of [the JOA] by all parties."  The Court has

made its finding on this question as a matter of law, without reference to Mr.

Daily's expert report.  Accordingly, the motions to exclude testimony are moot.

## V.

For the reasons stated, IT IS HEREBY ORDERED that:

(1) Plaintiff Shale's motion for partial summary judgment against
Defendant/Cross Claimant Flywheel for breach of contract [ECF No. 78] is
DENIED.

(2) Plaintiff Shale's motion for partial summary judgment against
Defendant/Cross Claimant MMGJ as to statutory claims [ECF No. 84] and
motion for partial summary judgment against Defendant/Cross Claimant
Flywheel as to statutory claims [ECF No. 95] are DENIED.

(3) Defendant/Cross Claimant Flywheel's motion for summary judgment
[ECF No. 92] is GRANTED IN PART AND DENIED IN PART.  The
motion is granted only to the extent that the Court finds that the subject
overriding royalties qualify as "subsequently created interests" under the
joint operating agreements.  Accordingly, MMGJ remains liable to pay
Shale its share of production under the overriding royalties and must
indemnify Flywheel with respect to payments due Shale.   Flywheel's
motion is denied in all other respects.

(4) Defendant/Cross Claimant MMGJ's motion for partial summary
judgment against Defendant/Cross Claimant Flywheel for breach of
contract [ECF No. 87] is DENIED.

(5) Plaintiff Shale's motion [ECF No. 82] and Defendant/Cross Claimant MMGJ's motion [ECF No. 90] to exclude the opinion of Thomas A. Daily are DENIED AS MOOT.

(6) As requested by Defendants/Cross Claimants [ECF No. 137], the parties have fourteen days from the entry of this order to file a proposed trial plan.

IT IS SO ORDERED THIS 23RD DAY OF JULY, 2020.


/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE